THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| E. JAMES SPAHR and COLLEEN SPAHR,<br><br>Plaintiffs,<br><br><br>vs.<br><br><br>FERBER RESORTS, LLC d/b/a RODEWAY INN,<br><br><br>Defendant, | **ORDER and<br>MEMORANDUM DECISION**<br><br><br><br>Case No. 2:08-cv-72-CW |

Now before the court is Defendant Ferber Resort's motion for a judgment as a matter of law or, in the alternative, for a new trial or remittitur (Dkt. No. 26).[1] For the reasons discussed below, this motion is DENIED in its entirety.

**BACKGROUND**

Plaintiffs E. James Spahr and Colleen Spahr brought this action for negligence and loss of consortium against Ferber Resorts. In short, Mr. Spahr suffered a serious knee injury after falling

---

[1] Ferber Resorts' motion for oral argument on this matter (Dkt. No. 107) is DENIED. Ferber Resorts has already had two opportunities to argue its position at summary judgment and at trial. Moreover, oral argument will not assist the court in resolving this motion, as it is not particularly complicated. Under DUCiv.R. 7.1(f), therefore, Ferber Resorts has not shown good cause to hold a hearing and this motion will be decided on the basis of the written memoranda.

into a six foot deep concrete ditch while he walked from his room toward the motel office across a parking lot of the Rodeway Inn operated by Ferber Resorts. The Rodeway Inn was located in Springdale, Utah and the accident happened in the early morning hours. The Spahrs contended that Ferber Resorts failed to provide adequate lighting and protection for guests against falling in the ditch, since it was open, very near the parking lot connecting the guest buildings and the office building, and could be mistaken for a continuation of the parking lot in the early morning darkness.

A week-long jury trial was held starting on October 19, 2009. At the close of the Spahrs' evidence, Ferber Resorts moved for a judgment as a matter of law on both counts. The court denied this motion. On October 23, 2009, the jury reached a verdict in favor of the Spahrs on both claims, finding on the negligence claim that Ferber Resorts was 99% at fault for the accident, while Mr. Spahr was 1% at fault. The court entered judgment on the jury's verdict on October 29, 2009 in the amount of $393,001.45 in favor of Mr, Spahr and $42,498.55 in favor of Ms. Spahr.

Ferber Resorts made a timely motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 or alternatively for remittitur or a new trial pursuant to Rule 59. In support of its motion for judgment of a matter of law, Ferber Resorts contends that the verdict was contrary to law because Ferber Resorts owed no duty to Mr. Spahr and because Ms. Spahr did not satisfy the requirements under Utah law for her loss of consortium claim. In support of its request for new trial or remittitur, Ferber Resorts asserts that the verdict was against the weight of the evidence, that the awards were excessive, and that the jury was improperly

prejudiced by the Spahrs' closing arguments.

ANALYSIS

## I.    Legal Standards

### A.    Judgement as a Matter of Law under Rule 50

"Judgment as a matter of law is appropriate only when the evidence presented at trial does not permit a reasonable jury to find for the non-movant." *Manzanares v. Higdon*, 575 F.3d 1135, 1142 (10th Cir. 2009) (citations omitted). In deciding such a motion, a court must "not weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury." *Id.* (internal quotation marks and citation omitted). Further, the court "must view the evidence and all inferences in the light most favorable to. . . the non-moving party, and. . . must be guided by the requirements of the underlying cause of action." *Palmer v. City of Monticello*, 31 F.3d 1499, 1503 (10th Cir. 1994).

### B.    New Trial or Remittitur under Rule 59

A motion for a new trial or remittitur under Rule 59 should be granted only if the jury's verdict is "clearly, decidedly or overwhelmingly against the weight of the evidence." *Escue v. Northern Okl. College*, 450 F.3d 1146, 1157 (10th Cir. 2006) (internal quotation marks and citation omitted). Moreover, when considering such a motion, "the jury's award is inviolate unless. . . it [is] 'so excessive that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial.'" *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 766 (10th Cir. 2009) (citation omitted). As with a motion under Rule 50, when considering a motion under Rule 59 for a new trial or remittitur,

all evidence must be viewed in the light most favorable to the prevailing parties.  *See Escue*, 450

F.3d at 1156.

## II.     Ferber Resorts' Motion

### A.     Judgement as a Matter of Law under Rule 50

Ferber Resorts argues that it is entitled to judgment as a matter of law on both Mr.

Spahr's negligence claim and Ms. Spahr's loss of consortium claim.  The evidence at trial was

sufficient to support the jury verdict finding Ferber Resorts liable on both claims, requiring the

court to deny both motions.

#### 1.     Ferber Resorts Owed a Legal Duty to Protect Mr. Spahr from a Dangerous Condition.

Ferber Resorts contends that Mr. Spahr knew that he was walking into the darkest part of

the property and took the risk that he might be injured as a result.  According to Ferber Resorts,

Mr. Spahr's doing so relieved Ferber Resorts of any legal duty to Mr. Spahr.

The court concludes that the evidence does not compel a finding that, because Mr. Spahr

knew it was dark, the dangerous condition at the Rodeway Inn should have been open and

obvious to him.  To the contrary, Mr. Spahr presented evidence that reasonably supported the

jury's finding that Ferber Resorts had a legal duty to provide adequate lighting and otherwise

protect against the risk that a person would not see the ditch while attempting to walk from the

motel rooms to the motel office.  For example, Mr. Spahr testified that while attempting to reach

the office in the early morning hours he was not simply walking into a pitch dark area.  Rather,

he recalled that there was bright lighting near the guest buildings and ambient lighting as he

walked away from the guest buildings.  Moreover, there was a light on near the office which he

testified he was walking directly toward.  There was also evidence that the drive way light on the pole next to the ditch was not on, the automatic timer apparently having turned the light off long before day light.  This testimony was corroborated by other evidence.  Mr. Spahr further testified that the area of the ditch that he walked into appeared to him to be a continuation of the pavement, not simply an abyss.  The photographs of the ditch and its surroundings, as well as other evidence, support this testimony.  This testimony, along with other evidence, supports a finding that the darkness into which Mr. Spahr walked did not alone reasonably put him on notice of a danger.[2]

Ferber Resorts relatedly argues that the question regarding an open and obvious danger on the verdict form was improper.  On the form, the jury was asked if the condition of the land was an open and obvious danger to Mr. Spahr.  Ferber Resorts contends that the jury should have

---

[2] Ferber Resorts also argues in reply that the darkness was the only possible source of negligence and that darkness was a temporary condition of which Mr. Spahr did not show Ferber Resorts had notice.  First, because Ferber Resorts makes these arguments for the first time on reply and not in response to any argument in Mr. Spahr's opposition, they may be disregarded.  In any event, these arguments have no merit.  The facts support a conclusion that it was negligent for Ferber Resorts to leave the ditch unlit and unprotected because it was reasonably foreseeable that someone exercising proper care might nonetheless fall in the ditch.  More specifically, the jury could have reasonably concluded that it was reasonably foreseeable to Ferber Resorts that a guest in low lighting might mistake the ditch for a continuation of the parking lot's pavement.  Moreover, it is clear that Ferber Resorts made a decision to place the lights on an automatic timer that turned the lights off before day light during part of the year.  The dangerous condition was created by the lack of lighting and the unprotected ditch opening.  While providing lighting might have helped to avoid a negligence claim, the lack of lighting was not the only cause of the dangerous condition here.  Accordingly, the jury could have reasonably concluded that even if the accident had occurred before the automatic light turned off,  Ferber Resorts was still aware of a dangerous condition under Ferber Resorts' control.  In any event, in Instruction 22, the jury was specifically informed that a business owner cannot be held liable for a condition of which the owner had no knowledge.  Ferber Resorts was therefore free to argue to the jury that it had insufficient notice to say that it knew of any danger.

been separately asked whether the darkness alone was open and obvious to Mr. Spahr and whether he knowingly took a risk by walking into that darkness. But there is no Utah case in which darkness by itself governed the open and obvious inquiry. Rather, in cases such as *Black v. Nelson*, 532 P.2d 212, 212-14 (Utah 1975), Utah courts look at all the circumstances in which the plaintiff found him or herself in darkness, including, among other things, the degree of the darkness, the characteristics of the area in which the plaintiff encountered the darkness, and the obvious alternatives to walking into the darkness. The Second Restatement of Torts, on which Ferber Resorts relies, underlies this principle, stating that if a "person knows of *the actual conditions and dangers* involved," then such a person can be said to have purposely incurred a risk. Restatement (Second) of Torts § 343(A) (emphasis added). This statement of the law makes plain that darkness is but one factor in the factual analysis of whether there was a known danger. In this case, the evidence fairly supported a jury finding that the darkness was only one factor that created the dangerous condition.

In any event, Ferber Resorts was free to, and did, argue to the jury that the darkness was so extreme that any reasonable person would have taken the darkness alone as a danger. Ferber Resorts also made other arguments that the danger was open and obvious. For example, Ferber Resorts pointed to safer alternatives that Ferber Resorts contended should have been obvious to Mr. Spahr. Ferber Resorts also argued that Mr. Spahr was not walking on pavement immediately before he fell into the ditch, and the characteristics of the terrain on which he was walking should have given him notice of a potential danger. Ferber Resorts also suggested that during his several day stay at the motel Mr. Spahr had seen or should have seen the area into which he fell

before he attempted to walk to the office in the dark. None of these arguments were precluded by the form of the question on the verdict form. If the jury had accepted them, it would have been reasonable for the jury to find that the danger was open and obvious to Mr. Spahr on Question 1 of the form, or alternatively that Mr. Spahr was over 50% at fault. And the jury was expressly instructed to, and in fact did on the verdict form, consider and quantify the extent of Mr. Spahr's own actions in causing the accident.

And the evidence indeed reasonably supported the jury's nearly complete rejection of Ferber Resorts' arguments, which was reflected in the verdicts that the dangerous condition of the land was not open and obvious to Mr. Spahr and that he was only 1% at fault. As already mentioned, Mr. Spahr testified that he was not in total darkness and did not believe he was walking into it either. This testimony rebuts the arguments that the darkness alone was a known danger to Mr. Spahr and that he had some reason to seek out another route. Mr. Spahr also testified that he was walking on pavement immediately before he fell which the jury could have reasonably believed. Mr. Spahr further testified that he had not previously noticed the ditch into which he fell which the jury was also free to believe.

In sum, Mr. Spahr presented evidence sufficient to support his contention that the dangerous condition at the Rodeway Inn was not open and obvious to him. He was therefore not precluded from claiming that Ferber Resorts owed him a legal duty of care.

### 2.    The Evidence Supports the Verdict for Loss of Consortium.

Ferber Resorts asserts that Ms. Spahr did not prove a significant injury to Mr. Spahr sufficient to satisfy Utah Code Annotated § 30-2-11, the loss of consortium statute. Specifically,

Ferber Resorts contends that Ms. Spahr did not present evidence that Mr. Spahr was "paralyzed," that he had a "significant disfigurement," or that he was "incapable" of performing the types of jobs he did before the injury as required by § 30-2-11(1)(a).

Mr. Spahr did not claim to have been paralyzed and no evidence was offered to support such an assertion. Ms. Spahr did, however, present evidence of scars on Mr. Spahr's knee, a fact that Ferber Resorts concedes. The most striking evidence was a photograph taken shortly after the injury showing massive and deep scarring. This photograph was received together with testimony that the scarring was at present slightly less pronounced than in the picture. There was further testimony that Mr. Spahr was ashamed to be seen in shorts because people might see the scarring to his knee. While neither party has cited any Utah authority establishing what exactly is required to show a "significant disfigurement" under § 30-2-11(1)(a)(ii), the court is convinced that the extreme scarring to Mr. Spahr's knee reasonably meets that definition.[3]

Moreover, there was evidence that Mr. Spahr was unable to perform key aspects of the types of jobs he did before the injury. For example, Ms. Spahr presented evidence that Mr. Spahr could not kneel to garden and could not climb ladders to engage in carpentry. Ferber Resorts contends that "incapability" in § 30-2-11(1)(a)(iii) must be read literally, meaning that if Mr. Spahr has any possible means to perform jobs, he is capable of those jobs.[4] Such a literal reading

_____

[3] The court is not convinced to the contrary by *Stone v. Ware Shoals Mfg. Co.*, 7 S.E.2d 226, 227-29 (S.C. 1940), which is an extremely dated, non-Utah case interpreting the question of what was meant by "serious bodily disfigurement" under South Carolina's then-existing worker's compensation statute.

[4] Ferber Resorts also contends that "jobs" must mean paid employment. There is nothing in the statute that compels that reading, and the word jobs is commonly understood to include

of the statute is not warranted by the face of the statute. Unless they are paralyzed (which is covered separately by § 30-2-11(1)(a)(I)), resourceful people may often find new and inventive ways to accomplish many of the same jobs they did before injury. For example, Mr. Spahr may be able to garden laying down, or to buy a hydraulic lift to help him build ceilings or complete other jobs that would be normally done on a ladder. Rather than being literally and completely incapable of doing a job even in a most limited and extraordinary way, then, being unable to engage in an essential part of a job in a routine manner must suffice to make one incapable of performing that job under the statute. In this case, the evidence reasonably supported a finding by the jury that Mr. Spahr was incapable of performing many of the jobs he had done before the injury. It cannot be reasonably disputed that as a routine matter, gardening requires kneeling and carpentry requires climbing ladders.

The Utah Court of Appeals' decision in *Boyle v. Christensen*, 219 P.3d 58, 63 (Ut. Ct. App. 2009) does not persuade the court otherwise. In *Boyle*, the injured party admitted in his deposition that he had performed the same jobs after his injury that he had performed before his injury, albeit in "significant discomfort." *Id.* In that context, the *Boyle* court found that the party was capable of doing those jobs, noting that "the statute does not speak in terms of impairment, but, rather, 'incapacity.'" *Id.* (citing Utah Code Annotated § 30-2-11(1)(a)(iii). Here, the record supports a conclusion that Mr. Spahr is not simply in discomfort doing jobs he had done before, but is incapable of kneeling and climbing ladders. Accordingly, Ms. Spahr's claim does not hinge on an argument that he is impaired in his gardening and carpentry, but on proof that he is

---

paid and unpaid pursuits.

altogether precluded from them.[5]

For the above reasons, the evidence supports a finding by a reasonable jury that Mr. Spahr was either significantly disfigured, incapable of performing jobs he did before the injury, or both. Either of these findings supports the conclusion that Mr. Spahr was significantly injured as defined by the Utah loss of consortium statute. Accordingly, Ms. Spahr was not precluded as a matter of law from proceeding on her loss of consortium claim.

**B.      New Trial or Remittitur under Rule 59**

Ferber Resorts argues that a new trial or remittitur should be granted for several reasons, all of which are broad and largely without objections made during the trial. First, it argues that no substantial evidence supported the amounts awarded by the jury. Next, it argues that the verdicts resulted from inappropriate and reversible passion, bias and/or prejudice stemming from the Spahrs' closing arguments. The court will address the Ferber Resorts' arguments below.

**1.      The Size of the Non-economic Damage Awards is Not Excessive Given the Evidence Presented.**

Ferber Resorts contends that the size of the damage awards – about $393,000 in Mr. Spahr's favor and about $42,500 in Ms. Spahr's favor (both to be reduced by 1% due to Mr. Spahr's fault in the accident) – are either shocking to the judicial conscience or are so excessive as to "raise an irresistible inference of passion, prejudice or other improper cause." *Blanke v. Alexander*, 152 F.3d 1224, 1237 (10th Cir. 1998). As a remedy, Ferber Resorts seeks either

---

[5] Even if the court has improperly distinguished *Boyle* and a more correct reading of the statute would lead to the conclusion that Mr. Spahr is not incapable of performing these jobs, a straight forward reading of the statute makes clear that Ms. Spahr needed only to prove one of the three factors under § 30-2-11(1)(a)(I)-(iii).

remittitur of the awards or a new trial.

Ferber Resorts' arguments are not well taken. Far from making a bare or unsupported assertion of non-economic damages, the Spahrs put on a great deal of evidence to support that claim. Mr. Spahr testified to the considerable pain, mental and emotional suffering and serious life consequences he has experience since his injury.[6] Mr. Spahr described in detail the agony he suffered when he fell into a nearly six-foot concrete ditch in which he landed almost full-force on his knee. He testified that the fall was a complete surprise and that he had no opportunity to brace or otherwise protect himself from injury on impact. He recalled calling for help for 20 minutes or more without any response and not knowing when he might be found. He explained that he had to stand on an injured leg to cry for help. He described having to devise a strategy to save his strength to maximize his chances of being rescued and not exhaust himself from yelling. He recounted having to hide his bloodied knee when he was finally pulled from the ditch so that his wife would not be overly traumatized by the sight of it. There was evidence that the long ambulance ride to the hospital was bumpy and painful for Mr. Spahr. There were photos of the injuries on Mr. Spahr's entire body from the fall, not limited to his knee. He presented evidence of the need for emergency surgery and the hospital stay afterwards. The painful and awkward

---

[6] Oddly, Ferber Resorts cites *Smith v. Northwest Fin. Acceptance, Inc.*, 129 F.3d 1408, 1416 (10th Cir. 1997) to suggest that only "exceedingly graphic or detailed" testimony will support substantial non-economic damages. The court reads *Smith* as making clear that graphic or detailed testimony is not needed for such damages, especially when the totality of the circumstances is considered along with the testimony. *See id.* While Mr. Spahr was somewhat stoic during his testimony, the court does not believe that this stoicism compels a conclusion that the accident had an insignificant physical and emotional effect on him. In any event, the jury could reasonably find that Mr. Spahr gave detailed and graphic description of his injury.

multi-legged trip home from Utah to Nevada to Michigan was detailed. And there was evidence of the arduous, painful, and uncomfortable months-long period of recuperation and physical therapy. Mr. Spahr further put on evidence that he could expect pain, suffering, and a limited range of motion in his knee into the future.

Mr. Spahr also detailed the effects of the injury on his personal life. There was evidence that the injury interfered and continues to interfere with the intimacy between the Spahrs. There was evidence that Mr. Spahr will no longer be able to garden or work as a carpenter. There was further evidence that he will be impaired or unable to do other activities that he was looking forward to in his retirement, such a water skiing, snow skiing, racquetball, jogging and hiking. The evidence was that Mr. Spahr enjoyed these activities before the injury and would no longer be able to engage in them. Indeed, the Spahrs were at the Rodeway Inn to hike in national parks.

In light of the evidence that Mr. Spahr put on regarding his non-economic harm, the court's conscience is not shocked by the size of the award. While $393,000 is a considerable sum, it can hardly be called a windfall when one considers the evidence put on about the incident and its consequences. Moreover, while this figure is more than ten times the approximately $30,000 in medical bills that Mr. Spahr put on as evidence, there is no question that the injury was serious and extensive and required a significant period of recuperation. The law does not require a direct correlation between the evidence of the amount paid for medical care and the award for the total injury. The overall harm to the person, taking into account the impact it may have on all aspects of life, may significantly exceed the out-of-pocket costs for medical care. For all these reasons, the court does not believe the award to Mr. Spahr to be so excessive as to "raise

an irresistible inference of passion, prejudice or other improper cause." *Blanke*, 152 F.3d at 1237.

Likewise, Ms. Spahr put on ample evidence of the non-economic impact of the accident on her. She testified to the shock and trauma of being awakened by a stranger and then discovering Mr. Spahr visibly injured and in agony. She described having to take on unfamiliar responsibilities at a time of great stress. She detailed her own emotional pain at watching Mr. Spahr in physical and emotional pain and discomfort from the time of the accident until the present. She testified to her interrupted sleep, life, and work schedules while helping Mr. Spahr recuperate. She affirmed the negative impact on her intimate life with Mr. Spahr. And she described the loss of Mr. Spahr's companionship while she participates in activities that he is unable to do or finds too painful to enjoy.

To be sure, $42,500 is a not an insignificant amount of money. But given the evidence that Ms. Spahr put on, it can hardly be said to shock the conscience. Moreover, while Ms. Spahr put on evidence of lost wages of only about $3,000, the impact of this accident was felt by Ms. Spahr in every aspect of her life, not just professional. The award to Ms. Spahr is thus not "so excessive as to raise an irresistible inference of passion, prejudice, or other improper cause." *Id.*[7]

---

[7] The court agrees with the Spahrs that the facts and the figures in this case are strikingly similar to those in *Blanke*, in which the court upheld substantial non-economic damage awards. While *Blanke* gives a comfort level that the awards here are appropriate, the court is aware that each case must be considered on its own individual merits, and it has done so here.

2. **The Spahrs' Closing Argument, While Inappropriate or Inartful in Some Aspects, Did Not Unduly Prejudice Ferber Resorts.**

Ferber Resorts contends that the Spahrs' closing argument was so improper as to warrant a new trial. Ferber Resorts points to four main categories of argument that it maintains were improper: referring to matters out of evidence, advancing personal opinions of counsel, implying intentional malevolence by Ferber Resorts, and making improper references to Ferber Resorts' actions in defending this lawsuit.

First, Ferber Resorts' complaint is procedurally flawed. It is well established that a party must bring to the attention of the court errors that can be corrected during the trial. Ferber Resorts objected only once to one line of argument during Spahrs' closing and the objection was immediately sustained. Ferber Resorts did not object to any other part of the closing and did not request a corrective instruction. Moreover, Ferber Resorts did not move for a mistrial based on the closing argument before this case was submitted to the jury. In *Computer Systems. Engineering Inc. v. Qantel Corp.*, 740 F.2d 59, 69 (1st Cir. 1984), the court ruled that a party's failure to object during close or to move for a mistrial barred the party from later "urging the improper argument as grounds for a new trial after the jury had returned its verdict." (citations omitted). The court reasoned that "'a party may not wait and see whether the verdict is favorable before deciding to object.'" *Id.*

While the Spahrs do not cite a Tenth Circuit case in which a party was barred from requesting a new trial on these grounds, *Computer Systems* and its ruling was cited with approval in *Angelo v. Armstrong World Industries, Inc.*, 11 F.3d 957, 962 (10th Cir. 1993). It is therefore probable that the Tenth Circuit would approve of the court following *Computer Systems* in this

-14-

case.  Accordingly, the court agrees with the Spahrs that Ferber Resorts' failure to object alone

justifies the denial of this motion to the extent it is based on improper close.  This is especially

true in light of the fact that the one time Ferber Resorts did object, the objection was immediately

sustained.

Second, even if Ferber Resorts' failure to make timely objections or a motion for a

mistrial does not preclude this motion, the court alternatively finds that any claims of impropriety

in the closing did not, in context and in the totality of the argument, unfairly prejudice Ferber

Resorts.  Ferber Resorts fails to meet the relevant standards for the motion to prevail.  In the

Tenth Circuit, vacating a jury award and ordering a new trial on the basis of an inappropriate

closing argument is an extreme remedy only to be granted in unusual cases.  This proposition is

made clear in *Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122, 1124 (10th Cir. 2009), a case

relied upon heavily by Ferber Resorts.  In *Whittenburg*, the Tenth Circuit described itself as

"reluctant" to order a new trial based on an improper closing argument.  This reluctance would

be unremarkable except for the fact that the *Whittenburg* court analyzed a closing argument that

was blatantly improper in its entirety, since it compromised mostly of "fictitious admissions,"

and "vituperative and unprovoked attacks on defendants and their counsel" made with unusual

"volume and volubility," that the impropriety continued "unrebuked despite contemporaneous

objections" and that the impropriety had an "apparent influence" on the jury's verdict.  *Id.*  The

*Whittenburg* court emphasized that it was only a "confluence of these three factors-the

extensiveness of the improper remarks, the absence of any meaningful curative action, and the

size of the verdict" that compelled the new trial in that case.  *Id.* at 1133.

Put another way in another Tenth Circuit case, "even though an argument may be improper, a judgment will not be disturbed unless it clearly appears that the challenged remarks influenced the verdict." *Lambert v. Midwest City Mem. Hosp. Auth.*, 671 F.2d 372, 375 (10th Cir. 1982) (citations omitted). Further, "[i]n applying this standard, we have consistently afforded trial counsel considerable leeway." *Id.* On the other hand, when "extraneous matter" is included in closing, the court must decide whether they had a "reasonable probability of influencing the jury." *Id.* (citation omitted).

The Spahrs' closing arguments in a few instances crossed the sometimes fuzzy line between proper and improper. On occasion counsel spoke in terms that could have been understood by the jury to be his personal beliefs as to how the evidence should be viewed. But as a whole, the court is confident that the closing fell considerably and decisively short of the level of impropriety that would merit a new trial. Ferber Resorts' arguments otherwise, discussed below, are not persuasive.

First, Ferber Resorts contends that the Spahrs made at least seventeen arguments based on matters not in the record. Before addressing any of these points specifically, it must be pointed out that the court gives weight to the fact that in this case, the jury was instructed that attorney argument is not evidence on two occasions: once before the opening statements and once before the closing arguments. The Tenth Circuit has emphasized that such instructions can mitigate the effects of references to matters not in evidence. *See Whittenburg*, 561 F.3d at 1131 ("[W]e have sometimes suggested that a general instruction at the close of trial, reminding the jury that counsels' arguments are not evidence, can help mitigate an improper closing argument.")

(citation omitted).  Moreover, in the instructions given before closing arguments, the jury was told in Instruction 11 that "If any reference by the court or by the attorneys to matters of evidence does not coincide with your own recollection, it is your recollection which should control during your deliberations."  Even further, the court provided each juror with a written copy of the jury instructions, including the instructions making clear that attorney argument is not evidence and that the jurors' recollection controls.  The jurors were allowed to follow along on the written instructions while the court read them and to take their individual copies into the jury room.  The court is thus satisfied that the jurors were well informed that they should ignore any allegations or argument that were not supported by the record and assumes that the jury understood that charge.

Turning to the substance of the arguments, the court agrees with the Spahrs that many of the arguments that Ferber Resorts asserts are unsupported by the record were in fact "comments to evidence in the record and reasonable inferences from that evidence."  *Id.* at 1125 (citations omitted).  For example, the court agrees, after looking at pictures of the ditch as it existed at the time of the accident, the jury could reasonably infer that a child could have fallen into it.  Making this argument did not require evidence that a child had actually done so.  As another example, Ferber Resorts emphasized at various points in its examination and evidence presented during the trial the fact that Mr. Spahr had beer in his cooler at the time of the accident.  It was also Ferber Resorts that elicited testimony from the officer who initially responded to the scene of the accident that the officer thought that Mr. Spahr must have been drunk to have fallen into such an obvious hazard.  The Spahrs' attorney was thus justified in arguing that Ferber Resorts was trying

to portray Mr. Spahr as a "stumbling drunk," even if Ferber Resorts' attorney subjectively believes otherwise. Moreover, as to the several examples of the Spahrs' attorney arguing that Mr. Spahr would have lifelong pain, there was evidence that allowed the jury to infer that he would have such pain.

Ferber Resorts also points to a few instances when the Spahrs' attorney argued that Ferber Resorts had viable alternatives to leaving the ditch and its surroundings in the condition they were in at the time of the accident and that blaming guests appeared to be a cheaper idea for Ferber Resorts. Ferber Resorts argues that the Spahrs should not have made such an argument because Ferber Resorts did not argue that it had no feasible alternatives. But Ferber Resorts cites no case law for the proposition that the defense must first raise an issue before the plaintiff can argue that was a reason for the defendant's action. Further, it is quite clear from the closing that it was the Spahrs attorney's theory only that Ferber Resorts believed blaming guests to be cheaper than fixing problems. As such, this contention was not portrayed as a fictitious admission by Ferber Resorts, as in the *Whittenburg* case, but rather as an opinion of the Spahrs' attorney. The expression of that personal opinion was not in good form, but it was a minor point in the overall argument and was not emphasized to the point that it should be concluded it improperly influenced the jury.

To the extent that the Spahrs' attorney did a few times refer to matters that were not arguably supported by the record, the court finds that they were "minor aberrations" unlikely to have prejudiced the jury. *Id.* at 1128. For example, the Spahrs' attorney's references to the employer/employee relationship were obviously an analogy intended to explain the concept of

compensatory damages. Those references were thus not likely to have confused the jury or to have made the jury believe that Ferber Resorts employed Mr. Spahr.

For all these reasons, the court finds that the arguments made in closing argument that Ferber Resorts characterized as references to matters not on the record were unlikely to have improperly influenced the jury.

The next category of purportedly improper arguments are what Ferber Resorts characterizes as personal opinions of counsel, of which Ferber Resorts cites eight. First, the court acknowledges that some of the instances where Spahrs' counsel used the phrases "I think" and "it seems to me" were not in good form and counsel would be better advised to be more careful in his use of language. Nevertheless, in the context of the closing as a whole, it was clear that counsel was speaking in a colloquial sense and was not attempting to offer a personal assessment. Moreover, the court is baffled by Ferber Resorts' apparent contention that it is improper for counsel to make arguments about witness' credibility. That is exactly a purpose of closing. Calling his clients decent and honest, saying his expert is honest, and asserting that an opposing witness' testimony is not worth a hill of beans are precisely what the Spahrs' counsel was expected to do at closing. In zealously representing his clients, counsel could properly make those arguments. What would have been improper is for the Spahrs' counsel to purposely give the impression that he had formed a personal opinion based on information known to him but outside of the record. *See, e.g.*, *Whittenburg*, 561 F.3d at 1130. But at no point during the closing did the court believe that counsel acted so outside of the leeway properly allowed to him to require a conclusion that he was trying to press his personal opinion on the jurors instead of

his passionate arguments on the case, nor is there any reason to believe that the jurors so understood the arguments.

The third category of improper argument that Ferber Resorts identifies is allegations of intentional malevolence by Ferber Resorts. As Ferber Resorts points out, a suggestion by plaintiff's counsel that the defendant "acted with a degree of calculated intentional malevolence" is one that "has no foundation in [a] trial on negligence." *Id.* at 1129. In reviewing the nine instances of such conduct specified by Ferber Resorts, the thrust of most of the arguments is that Ferber Resorts is trying to escape responsibility for the safety of guests and the injury to Mr. Spahr.[8] The court accepts that these arguments may have implied some level of malevolence by Ferber Resorts, which was improper in this negligence trial. But the prejudice that might have been caused by this line of argument did not rise to the level at which the court needs to start seriously considering a new trial. For example, in *Whittenburg*, not only did the plaintiff invent an admission by the defendant that the defendant was going to act recklessly and then relentlessly and cruelly attack the plaintiff to try to get out of it, but the jury was asked to put itself in the plaintiff's children's shoes in considering this admission. *See id.*[9]

---

[8] There are also instances of appearing to disparage Ferber Resorts for defending this action, which are addressed below.

[9] Moreover, the court observes that during Ferber Resorts' closing, its counsel did not always treat the Spahrs with a gentle touch either. For example, as the court recalls (though without referring to the transcript), Ferber Resorts' counsel argued that Mr. Spahr's decisions on the morning of the injury were alternatively idiotic, stupid and boneheaded. And none of these adjectives are needed to show simple negligence, which is simply failing to use reasonable care. Accordingly, Ferber Resorts's closing was not without some level of impropriety that was fair game for the Spahrs to "cancel out." *Id.* at 1130.

The final type of argument Ferber Resorts identifies is the Spahrs' counsel appearing to disparage Ferber Resorts for defending this action, suggesting that Ferber Resorts' actions in defending the litigation are appropriately considered in the liability and damages analysis, and making other similar references to Ferber Resorts' actions in defending this action. This ground is Ferber Resorts' strongest, and is "especially concerning" to courts considering this type of motion. *See id.* at 1129. A defendant has a right to deny the plaintiff's allegations and to vigorously defend against the claims. Plaintiff's counsel cannot properly argue to the jury that a defendant acted improperly or that the jury should punish a defendant for doing so. But for the reasons discussed below, the court is convinced that to the extent the Spahrs' counsel engaged in these types of improper arguments, the level of impropriety was not significant enough to vacate the award here.

First and most importantly, the court sustained Ferber Resorts' objection to the Spahrs' line of argument near the end of their closing that Ferber Resorts' actions in defending this suit harmed the Spahrs. These arguments were the most flagrantly improper and potentially influential ones that the Spahrs made. When Ferber Resorts' counsel objected to them, he gave as grounds that "this is going into conflated litigation difficulty with any sort of damages that are recoverable under tort law." (Trial Transcript, Dkt. No. 92-2 at Pages 30-31 of 36). The court sustained this objection, without any hesitation, without allowing argument by the Spahrs' counsel, and without qualifying counsel's description of the impropriety. Ferber Resorts did not request any corrective instruction. After the objection was sustained, the Spahrs' counsel again argued that a verdict in the Spahr's favor would restore their good name. But Ferber Resorts

failed to object or request any curative instruction to clarify what was wrong with the argument, nor did it move for a mistrial.

If this particular line of argument had played out differently, Ferber Resorts might have a stronger case for a new trial. But unlike in *Whittenburg*, the court intervened to decisively stop improper argument immediately in response to Ferber Resorts' sole contemporaneous objection. Ferber Resorts sought no remedy to the potential prejudice beyond the granting of its objection, and the grounds stated for the sustained objection made clear that litigation difficulties are separate from tort damages. While the Spahrs' counsel again made reference to restoring the Spahrs' good name by granting judgment in their favor, the jury was put on notice by the objection that damage to one's reputation is not properly considered in deliberating on a negligence case.

The other arguments of this type identified by Ferber Resorts were improper, but were not significant enough for the court to believe they had a likely influence on the jury. For example, when the Spahrs' counsel stated that he was irritated because it seemed that Ferber Resorts was exceeding the bounds of propriety, it was clear in the context of the trial that he was referring to his own agitated behavior on cross examining a defense witness. The suggestion that Ferber Resorts was behaving improperly was obviously attorney argument that the jury was instructed not to treat as fact. The Spahrs counsel's references to the number and costs of Ferber Resorts' experts were made in passing and may well have been evidence the jury was allowed to consider in considering what weight to give to their opinions. These references were therefore unlikely to have the effect of suggesting Ferber Resorts' wealth or reprehensibility in defending the action.

*Id.* at 1129-31. The court has reviewed the other instances identified by Ferber Resorts and is satisfied that they were unlikely to have influenced the jury.

## CONCLUSION AND ORDER

For all of these reasons, Ferber Resorts' motion for judgment as a matter of law and for remittitur or a new trial is DENIED.

SO ORDERED this 4th day of February, 2010.

BY THE COURT:

Clark Waddoups
United States District Judge